UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MOHAMMED MAHRAN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-7975 |
| | ) | |
| v. | ) | Hon. Jorge L. Alonso |
| | ) | |
| ROSELAND COMMUNITY HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

After plaintiff Mohammed Mahran ("Mahran") was discharged from his position as a staff pharmacist at defendant Roseland Community Hospital ("Roseland"), he filed a complaint in which he alleges he was discriminated against on the basis of his religion, national origin and sex in violation of Title VII of the Civil Rights Act of 1964, § 1981 and the Illinois Human Rights Act. Defendant moves for summary judgment. For the reasons set forth below, the Court grants in part and denies in part the motion for summary judgment.

**I. BACKGROUND**

The following facts are undisputed unless otherwise noted.[1]

---

[1] Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. The Court enforces Local Rule 56.1 strictly. *See McCurry v. Kenco Logistics Services, LLC*, 942 F.3d 783, 790 (7th Cir. 2019) ("We take this opportunity to reiterate that district judges may require strict compliance with local summary-judgment rules."). Where one party supports a fact with admissible evidence and the other party fails to controvert the fact *with citation to admissible evidence*, the Court deems the fact undisputed. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of the duty to support the fact with admissible evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012). Here, for example, defendant "disputed" without citation to evidence certain of plaintiff's facts. *See, e.g.,* docket 79 at ¶¶ 2, 19. To the extent plaintiff supported those facts with citation to

In the middle of 2017, Mahran, who is Muslim, applied for and received a position as a staff pharmacist at Roseland. When Mahran submitted his application, he indicated (correctly) that he is male and from Egypt. The application also required Mahran to acknowledge, "The hospital is a 24 hour operation and because of this I understand overtime, shift assignment, rotation shifts, weekend work, and holiday work may be required." Nonetheless, Mahran's offer letter, which he signed on or about June 9, 2017, stated that his shifts would be between the hours of 7:00 a.m. and 7:00 p.m. The offer letter also stated that he was hired at a "salary of $57 per hour." (Docket 61-6 at 4).

When he was hired, Mahran was given a copy of Roseland's Code of Ethics, which contained a diversity and equal opportunity statement. That Code states, among other things, that Roseland "refuses to engage in or tolerate any . . . form of discrimination or unlawful harassment." During Mahran's employment, Roseland also maintained an anti-harassment policy and complaint procedure, as well as an equal opportunity policy that prohibited discrimination and harassment.

The staff-pharmacist position for which Mahran was hired required him to fill orders for medications, monitor patient drug therapies and provide drug information. To be a staff pharmacist, defendant required Mahran to have a pharmacy degree and license and to apply his knowledge and experience to make decisions while verifying patient orders, consulting physicians and nurses to determine the best medication, assisting nurses with administering medication, consulting patients before discharge, taking histories from patients, adjusting medications and dosages, discontinuing medications and managing pharmacy operations.

---

admissible evidence, those facts are deemed undisputed. The Court does not consider any facts that parties failed to include in their statements of fact, because to do so would rob the other party of the opportunity to show that the fact is disputed.

When Mahran began his position at Roseland, he joined a group of fourteen or fifteen pharmacists and technicians, who were supervised by Pamela Tanyitiku ("Tanyitiku"), a pharmacist from Cameroon. Like Tanyitiku, two pharmacists and two technicians in the department were also from Cameroon, a fact that, to Mahran, suggested discrimination. Another pharmacist was from Nigeria. "Diverse" is how Paulette Clark ("Clark"), who was Roseland's Director of Human Resources during the time Mahran worked there, described the group of employees who made up the department.

Despite the seeming diversity, Mahran felt that he was treated unfairly. Mahran noticed that he was scheduled to work more night shifts (after 7:00 p.m.) and to be on call more than were employees who were not Muslim and not from Egypt. He noticed that other employees, including Miriam Ewang, David McNamara, Robert Wells, Lenee Souta, Jackie Silas, Gilda Shyne, Elaine Davis, Marcus Turner, Irene Mambo, May Oyatunde, Dena Roberts, Nigel Archibald, Noah Oben, Willie Mae Johnson and Lauren McCauley were rarely scheduled to work nights or to be on call. At some point, Mahran asked Tanyitiku why he was being scheduled for night shifts and closing shifts more often than were other pharmacists. Tanyitiku responded that Roseland is located in a dangerous area and that she thought it was better to schedule him, a single male, to work those shifts than to schedule women with children. By November 2017, pharmacist Lauren McCauley ("McCauley") was creating the department's schedule. On November 7, 2017, Mahran complained to Tanyitiku that McCauley was giving herself a better schedule than she gave Mahran. McCauley had a better schedule, because her schedule was established before Roseland hired Mahran. Mahran did not think seniority should matter given that Roseland's pharmacy department was not unionized.

Scheduling was not Mahran's only concern, and Roseland, for its part, had concerns about Mahran. At some point after Mahran started at Roseland, Tanyitiku told Clark (in Human Resources) that Mahran had made medication and dosing errors and that he was having difficulty formulating drugs. On August 31, 2017, Tanyitiku sent Mahran and three other pharmacists an email ordering them to report medication dosing errors that occurred within the department.

On or about September 24, 2017, Mahran complained to Tanyitiku about problems he was having with timekeeping and payroll. Tanyitiku resolved the September problems to Mahran's satisfaction, but Mahran continued to experience payroll issues. On at least six occasions in October, November and December 2017, Mahran complained to Tanyitiku about not being paid for all of the hours he had worked. Each of these payroll complaints was resolved to Mahran's satisfaction. In none of these complaints about payroll did Mahran suggest the problems were caused by unlawful discrimination.

On October 23, 2017, Tanyitiku emailed Mahran about responding to telephone calls while he was scheduled as the on-call pharmacist. The monthly schedule had indicated that Mahran was the pharmacist on call at the time. Mahran complained to Tanyitiku several times that the dissemination of the calendar had caused confusion, but he did not, in those complaints, complain about discrimination or harassment. Mahran asked the President of the hospital for a meeting regarding scheduling, and the President said he would schedule one soon. On November 21, 2017, Jeraldine Shaffer ("Shaffer"), the Chief Nursing Officer, emailed Mahran about scheduling and noted that Mahran would be in charge of making the January schedule.

On the evening of November 16, 2017, Mahran emailed Tanyitiku to ask whether she would allow him to take his lunch break the following day from 1:40 p.m. to 2:10 p.m. so that he could perform his Friday prayer during that break. Tanyitiku did not respond. The next day,

4

Mahran asked Tanyitiku in person whether she could cover his position during that period. Tanyitiku refused to discuss the issue with Mahran, and Mahran was forced to miss his Friday prayer that day. Roseland contains a non-denominational prayer chapel that all individuals may use to pray.

On December 5, 2017, Mahran received a performance review from Tanyitiku and Shaffer. They accused Mahran of having made medication dosing errors and of twice having clocked into work two hours before his shift began. Mahran disagreed with the review. He wrote on the review that the criticisms were retaliation for his having raised patient-safety issues. He did not write on the review that he was being discriminated against on the basis of sex, religion or national origin. Finally, Mahran wrote on the review that he wanted two weeks to respond to the accusations of medication dosing errors.

Mahran then consulted Meditech, the software program Roseland used to document patient information, medication orders and inventory. Mahran reviewed the medication errors and confirmed to his own satisfaction that: (1) some of the supposed errors were not actual errors; and (2) among the actual errors, none had been committed by him but instead had been committed by Lauren McCauley and Irene Mambo.

On December 12, 2017, Mahran emailed Clark and the President to defend his work. He explained why he believed other employees had made the alleged dosing errors. Mahran also complained that his payroll issues were retaliation for his having complained about patient safety. Mahran accused Tanyitiku of discriminating against him on the basis of race, religion, sex and national origin.

Someone (it is not clear who) planned a meeting for December 14, 2017. Clark and Tanyitiku intended to speak with Mahran, along with Shaffer and the President, about the dosing

errors and Mahran's future. Mahran refused to meet. Clark informed Mahran that he would receive a letter that would state he was suspended pending an investigation. On December 15, 2017, Clark sent Mahran the promised letter, which informed Mahran he was suspended without pay.

Clark conducted an investigation of the dosing errors. She did not, however, investigate Mahran's complaints of discrimination even though she was the employee in charge of conducting such investigations. In investigating the dosing errors, Clark intended to treat all employees fairly and equally. Nonetheless, Clark spoke only to Tanyitiku in conducting her investigation. Clark testified that she was confident Tanyitiku convinced her that the dosing errors were Mahran's. Mahran disputes that the dosing errors were his. Clark testified that she was aware of up to five other employees who had made medication dosing errors, but she recalled only one whose employment was terminated. That one employee was first disciplined and then reminded "over and over" before being discharged.

On December 26, 2017, Clark sent Mahran a letter by Federal Express. In the letter, Clark notified Mahran that his employment was terminated due to dosing errors.

## II. STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). When considering a motion for summary judgment, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021 (7th Cir. 2018). Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial."

*Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

**III.    DISCUSSION**

Plaintiff filed his complaint *pro se* and has since retained counsel. In his complaint, plaintiff asserts that defendant violated Title VII by subjecting him to a hostile environment on the basis of his religion (Count I), national origin (Count II) and sex (Count IX). In Count V, plaintiff seeks relief under § 1981 for subjecting him to disparate treatment and a hostile environment on the basis of his race. In Count VII, plaintiff asserts that defendant violated the Illinois Human Rights Act by discriminating against him on the basis of his religion and national origin. Plaintiff also asserts that defendant retaliated against him in violation of Title VII (Count III) and the Illinois Human Rights Act (Count VIII). Finally, in Count IV,[2] plaintiff asserts that defendant violated Title VII by paying him less than non-Muslim pharmacists and violated the Fair Labor Standards Act by failing to pay him overtime pay. Plaintiff also alleges, but does not set out as a separate count, that in November 2017 he was denied an opportunity to take a prayer break.

Defendant moves for summary judgment on all of plaintiff's claims.

---

[2] This count is the first of two counts labeled V. (Complt. ¶¶ 80-89). Plaintiff's complaint does not include a Count VI.

A. **Disparate treatment**

1. **Sex-based disparate treatment**

In his complaint and in response to defendant's motion for summary judgment, plaintiff asserts that he was subjected to disparate treatment on the basis of his sex, which is male. In support of this claim, plaintiff put forth undisputed evidence that his supervisor told him that the reason he was scheduled for more evening shifts was that the hospital was located in a dangerous area such that it made more sense to assign a single male to those shifts than to assign a female with children.

Title VII of the Civil Rights Act of 1964 makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under Title VII, "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex or national origin was a *motivating factor* for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m) (emphasis added). The question for a Court considering a claim for disparate treatment under Title VII (or the Illinois Human Rights Act) is "whether the evidence would permit a reasonable fact-finder to conclude that [plaintiff] was subjected to an adverse employment action based on a statutorily prohibited factor." *McCurry v. Kenco Logistics Serv., LLC*, 942 F.3d 783, 788 (7th Cir. 2019). Of course, the Seventh Circuit has not overruled the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and, thus, "*McDonnell Douglas* burden-shifting

8

[remains] a viable option for pursuing employment discrimination claims." *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 629 (7th Cir. 2018).[3]

Here, plaintiff has sufficient evidence to allow a fact finder to conclude that he was treated differently on the basis of sex, but he does not have sufficient evidence to show he suffered an adverse employment action on that basis. "An adverse action is one that significantly alters the terms and conditions of the employee's job." *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004). Adverse actions tend to fall into three categories: "(1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 980 (7th Cir. 2014).

The Seventh Circuit has long held that mere assignment to a less desirable shift is not an adverse employment action. *Koty v. DuPage Cty.*, 900 F.3d 515, 521 (7th Cir. 2018) ("Changing an employee's shift is generally not considered a materially adverse employment action unless the change results in a change in pay or prestige or is particularly harmful to that employee. While the midnight shift may have been less desirable than [plaintiff's] original shift, he offered no evidence that the change affected his pay or prestige or that there was some unique circumstance in his case."); *Peters v. Wal-Mart Stores East, LP*, 512 Fed. Appx. 622, 626 (7th Cir. 2013) ("schedule assignments generally are not adverse employment actions"); *Ellis v. CCA*

---

[3] The Court notes that claims for reverse discrimination have slightly different requirements for making out a *prima facie* case of discrimination, *see, e.g., Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016), but that does not matter here given that plaintiff's sex-discrimination claim fails for lack of an adverse employment action.

9

*of Tennessee LLC*, 650 F.3d 640, 650 (7th Cir. 2011) ("A change in shift assignments will not normally be sufficient to qualify as an adverse employment action, unless it is accompanied by some other detriment."); *Griffin*, 356 F.3d at 829; *Grube v. Lau Industries, Inc.*, 257 F.3d 723, 728 (7th Cir. 2001) ("[Defendant's] decision to change [plaintiff's] working hours certainly does not rise to the level of an adverse employment action. [Plaintiff's] pay and job title remained the same, and she suffered no significantly diminished job responsibilities."). Here, plaintiff has not put forth any evidence that the schedule negatively affected his pay, benefits or job responsibilities or was otherwise detrimental.

Accordingly, plaintiff's claim that he was assigned more evening shifts and more time on call on the basis of his sex is not actionable. Defendant is granted summary judgment on that claim.

### 2. Disparate treatment based on religion or national origin

Plaintiff also asserts that he was treated differently on the basis of his religion and/or national origin. Specifically, plaintiff asserts that he was given more evening and on-call shifts than individuals who were not Muslim and/or were not from Egypt. He also asserts that he was suspended and then discharged, because he is Muslim and/or from Egypt.

As the Court explained above, plaintiff's schedule did not constitute an adverse employment action. Accordingly, defendant is granted summary judgment on plaintiff's claims that he was scheduled for more evening shifts and to be on-call more because of his religion or national origin.

Plaintiff has, however, established that he suffered two adverse employment actions. First, on or about December 15, 2017, he was suspended without pay. Such a loss of pay is obviously an actionable adverse action. *Alexander*, 739 F.3d at 980. Second, plaintiff was

10

discharged, which Title VII explicitly lists as a type of unlawful adverse action. 42 U.S.C. § 2000e-2(a)(1).

The question, then, for this Court is whether plaintiff has put forth evidence from which a reasonable fact finder could conclude that plaintiff was subjected to the discharge and/or suspension based on his religion or national origin. *McCurry*, 942 F.3d at 788. It is a close call, but the Court thinks he has. Plaintiff has put forth evidence that he was not the person who made the medication errors and that, instead, the errors were made by two pharmacists who were neither Muslim nor Egyptian. Neither of those pharmacists was suspended or discharged, which is to say they were treated more favorably than plaintiff. Plaintiff has put forth additional evidence that pharmacists were not always discharged for making medication errors. Specifically, plaintiff has put forth evidence that at least four other employees made medication errors but were not discharged. A fifth employee was discharged but only after first being disciplined and reminded "over and over" about dosing errors. Such selective enforcement challenges the veracity of the employer's reason for an adverse action. *Coleman v. Donahoe*, 667 F.3d 835, 857 (7th Cir. 2012) ("evidence of selective enforcement of a rule 'calls into question the veracity of the employer's explanation.'") (quoting *Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 601 (7th Cir. 2001)); *Baker v. Macon Resources, Inc.*, 750 F.3d 674, 677 (7th Cir. 2014) ("selective enforcement or investigation of a disciplinary policy can also show pretext"). Accordingly, defendant's motion for summary judgment is denied with respect to plaintiff's claims that he was suspended and discharged on the basis of his religion and/or national origin in violation of Title VII.

B.      Hostile environment

In his complaint, plaintiff asserts that he was subjected to a hostile environment. He asserts that defendant violated Title VII by subjecting him to a hostile environment on the basis of his sex, religion and national origin. He also asserts that defendant violated the Illinois Human Rights Act by subjecting him to a hostile environment on the basis of his religion and national origin.

The legal standards for actionable hostile environment under Title VII and the Illinois Human Rights Act are the same. *Mahran v. Advocate Christ Med. Ctr.*, 12 F.4th 708, 714 (7th Cir. 2021). A hostile environment can violate Title VII if it alters the terms and conditions of employment on the basis of a protected class. *See Smith v. Illinois Dep't. of Trans.*, 936 F.3d 554, 560 (7th Cir. 2019). "To prevail, a plaintiff must show that '(1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Mahran*, 12 F.4th at 714 (citation omitted). In considering whether the harassment was severe or pervasive, courts consider "the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Mahran*, 12 F.4th at 715 (quoting *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018)). Still, "Title VII imposes no 'general civility code,'" and comments that "may have made for a crude or unpleasant workplace" are not actionable unless they are connected to a protected class. *Smith*, 936 F.3d at 560-61 (citations omitted).

"An employer may be strictly liable for harassment by supervisors, but a negligence standard applies for harassment by coworkers." *Jajeh v. County of Cook*, 678 F.3d 560, 568 (7th

12

Cir. 2012). To hold an employer liable for harassment by a coworker, a plaintiff must show the employer "was negligent in either discovering or remedying the harassment." *Jajeh*, 678 F.3d at 569.

In his response to defendant's motion for summary judgment, plaintiff asserts that genuine issues of material fact warrant denial of summary judgment to defendant on plaintiff's hostile environment claims. (Plf. Brief at 4/Docket 73 at 4). Plaintiff also points out that a court is not to view the allegations in isolation. (Plf. Brief at 6/Docket 73 at 6). That is the extent of plaintiff's argument in support of his hostile environment claims. Nowhere in plaintiff's brief does he explain what evidence supports his hostile environment claims, how his evidence shows severe or pervasive conduct based on a protected class or why there is a basis for employer liability. It is not this Court's job to make his argument for him. *See Spath v. Hayes Wheels International-Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) ("[i]t is not [a] court's responsibility to research and construct the parties' arguments") (citations omitted); *see also Jeffers v. Commissioner of Internal Revenue*, 992 F.3d 649, 653 (7th Cir. 2021) ("We will not scour the record in an attempt to formulate a cogent argument when [a party] has presented none."); *Williams v. Board of Ed. of City of Chi.*, 982 F.3d 495, 511 (7th Cir. 2020) ("perfunctory and undeveloped arguments . . . are waived") (citation omitted). Plaintiff's hostile environment claims are waived. Defendant is granted summary judgment on those claims.

### C. Failure to accommodate religion

Next, plaintiff asserts defendant violated Title VII when his supervisor failed to cover his position so that he could take a break to pray.

Title VII of the Civil Rights Act of 1964 makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his

13

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII goes on to define religion as including "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). The Supreme Court has concluded that it is an undue hardship to require an employer "to bear more than a de minimus cost" to accommodate a religious practice. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977); *see also EEOC v. Walmart Stores East, L.P.*, 992 F.3d 656, 660 (7th Cir. 2021) (employers are not required to "bear more than a slight burden").

"An individual alleging religious discrimination must ordinarily show that: (1) a bona fide religious practice conflicts with an employment requirement, (2) he or she brought the practice to the employer's attention, and (3) the religious practice was the basis for the adverse employment action." *EEOC v. United Parcel Service*, 94 F.3d 314, 317 (7th Cir. 1996); *see also EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997) ("to establish a prima facie case of religious discrimination, a plaintiff must show that the observance or practice conflicting with an employment requirement is religious in nature, that [he] called the religious observance or practice to [his] employer's attention, and that the religious observance or practice was the basis for [his] discharge or other discriminatory treatment.").

Here, plaintiff has put forth evidence that he was denied, on one occasion, an opportunity to take a break to pray. Specifically, plaintiff put forth evidence that Tanyitiku, on November 17, 2017, failed to grant plaintiff's request that she cover his position during his lunch break so that he could perform his Friday prayer that day.

14

The problem with plaintiff's argument, as defendant points out, is that plaintiff has failed to identify an adverse employment action. Plaintiff seems to think the very denial of the prayer break is itself enough to support a claim of religious discrimination. Yet, *United Parcel Service*, 94 F.3d at 317, which this Court must follow, requires an adverse employment action. Plaintiff, himself, states that an adverse employment action is needed. (Plf. Brief at 14/Docket 73 at 14). An example of such an adverse action is when an employee is discharged for taking time off to observe a religious practice. *See, e.g., Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 454 (7th Cir. 2013) ("[Plaintiff] was absent to observe his religious practice, and he was fired as a result of that absence."). Here, plaintiff does not put forth evidence that he was discharged for abandoning his post for a prayer break. Instead, plaintiff put forth evidence that he missed a prayer, because his supervisor did not cover his post so that he could pray during his break.

Some courts have considered whether this sort of religious discrimination claim could be made with evidence merely that a request for religious accommodation has been denied even in the absence of an adverse employment action. *See, e.g., Nichols v. Illinois Dep't of Trans.*, 152 F. Supp.3d 1106, 1121-22 (N.D. Ill. 2016). This Court does not think such an interpretation would be consistent with the language of Title VII. It is true that, under the Americans with Disabilities Act ("ADA"), failure to provide a reasonable accommodation is itself a violation of the statute. That is because, under the ADA, the definition of *discriminate* includes "not making reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). The language of Title VII, however, is different. Failure to provide a religious accommodation is not within the definition of discriminate under Title VII. Rather, accommodation is within the definition of religion. Thus, "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any

15

individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's" need for a religious accommodation is a violation of Title VII. 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 2000e(j). That is a textual explanation for why claims of religious accommodation under Title VII require an adverse employment action, while claims for reasonable accommodation under the ADA do not. In any case, this Court must follow *EEOC v. United Parcel Service*, 94 F.3d 314, 317 (7th Cir. 1996), which requires an adverse action.

Because plaintiff has not put forth evidence of an adverse employment action resulting from his need for a prayer break, defendant is entitled to summary judgment on this claim.

### D. Remaining claims

Defendant also moves for summary judgment on plaintiff's remaining claims. Plaintiff did not respond to defendant's motion as to the remaining claims, so they are deemed abandoned, and any arguments in support of them are waived.[4] *See Little v. Mitsubishi Motors North Amer., Inc.*, 261 Fed. Appx. 901, 903 (7th Cir. 2008) ("[Defendant] sought summary judgment on all of [plaintiff's] claims. Although [plaintiff] had the burden to demonstrate that a genuine issue of fact existed as to each of them . . . he failed to present facts or develop any legal arguments on these issues; his response to [defendant's] motion focused exclusively on his RIF claim. Thus, as the district court correctly recognized, [plaintiff] abandoned his claims regarding discrimination, harassment and retaliation[.]"); *see also Burton v. Board of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017) ("[I]t is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. If the [nonmoving party] does not do so, and loses the

---

[4] It is not unusual for an attorney hired after a plaintiff files a pro se complaint to use his limited space to make arguments in support of plaintiff's strongest claims rather than to waste space on the weakest claims.

motion, it cannot raise such reasons on appeal.") (citations omitted). Accordingly, defendant is granted summary judgment on plaintiff's remaining claims.

## IV. CONCLUSION

For all of these reasons, the Court grants in part and denies in part defendant's motion [60] for summary judgment. The Court grants defendant summary judgment on every claim except plaintiff's claims that he was suspended and discharged on the basis of his religion and national origin in violation of Title VII. The Court also notes that defendant mistakenly filed a brief as an additional motion for summary judgment. That motion [77] is denied as moot. This case is set for a status hearing on March 2, 2022 at 9:30 a.m.

**SO ORDERED.**                                                                                          ENTERED: January 18, 2022

                                                                                                                        _____
                                                                                                                        **HON. JORGE ALONSO**
                                                                                                                        **United States District Judge**